## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS

| | |
|---|---|
| LABORERS' DISTRICT COUNCIL AND CONTRACTORS' PENSION FUND OF OHIO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>REATA PHARMACEUTICALS, INC., J. WARREN HUFF, and COLIN J. MEYER, M.D.<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Jury Trial Demanded |

Plaintiff Laborers' District Council and Contractors' Pension Fund of Ohio ("Plaintiff"), by and through their attorneys, allege upon personal knowledge as to their own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through their attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission ("SEC"), news reports, press releases issued by Defendants, and other publicly available documents:

### NATURE AND SUMMARY OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Reata Pharmaceuticals, Inc. ("Reata" or the "Company") securities between November 14, 2016 and December 6, 2021, inclusive ("Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      Reata is a clinical stage biopharmaceutical company headquartered in Plano, Texas, that purports to develop novel therapeutics with serious or life-threatening diseases.

3.      Among Reata's lead drug candidates under development is bardoxolone, which is intended to treat chronic kidney disease ("CKD") caused by Alport syndrome.

4.      The Phase 3 CARDINAL study was purportedly designed to measure the efficacy and safety of bardoxolone. The primary endpoint for Year 2 was the change from baseline in estimated glomerular filtration rate ("eGFR") after 100 weeks of treatment (end-of-treatment). The key secondary endpoint for Year 2 was the change from baseline in eGFR at Week 104 (four weeks after last dose in second year of treatment).

5.      After meeting with the U.S. Food & Drug Administration ("FDA") in October 2016, Defendants began touting the design of the Phase 3 trial to investors and making positive statements about the ongoing clinical studies for bardoxolone. Beginning on November 14, 2016, Defendant Huff and Meyer both highlighted that the FDA had given "clear guidance" on the trial design. Both said that the key secondary endpoint would be "the change from baseline in the estimated GFR after withdrawal of drug for four weeks." Throughout the Class Period, Huff, Meyer, and the Company repeatedly highlighted the use of the 4-week withdrawal periods in Phase 3 trial and emphasized the FDA's approval of "retained benefit" as an endpoint in multiple rare forms of CKD.

6.      On August 10, 2020 the first hint of trouble regarding Reata's New Drug Application ("NDA") for bardoxolone as a treatment for CKD caused by Alport syndrome to the FDA began to emerge. Reata revealed that the NDA might be delayed based on expected feedback from the FDA concerning the data Reata hoped to submit in support of the NDA. Reata had previously guided investors to understand that the NDA would be filed by year-end 2020. Reata's

stock price plunged by 33% on this news on August 10, 2020. Reata ultimately submitted its NDA on March 1, 2021.

7.      In April 2021, Reata announced that the FDA had accepted the bardoxolone NDA for review and that the FDA planned to convene and Advisory Committee Meeting before the February 25, 2022 Prescription Drug User Fee Act ("PDUFA") date.

8.      On December 6, 2021, the FDA released a briefing document ("Briefing Book") before the Advisory Committee Meeting to determine whether bardoxolone would be recommended for approval. The Briefing Book revealed, among other things, that the FDA had repeatedly "voiced concerns about the" secondary endpoint being used to determine whether bardoxolone was effective. These concerns were first raised by the FDA at an October 2016 meeting, and the FDA continued to raise those same concerns at two subsequent meetings with Reata executives.

9.      After the FDA released its Briefing Book on December 6, 2021, Reata's stock price plummeted 37%, falling from $78.83 per share to close at $48.92 per share, on unusually heavy trading volume.

10.     At the meeting held December 8, 2021, the thirteen members of the Advisory Committee voted unanimously against recommending bardoxolone for approval to the FDA, causing Reata's share price to fall further to close at $29.11 per share on December 9, 2021 – down more than 63% from the opening of trading on December 6, 2021.

11.     As one analyst from Jefferies commented, the chance of bardoxolone approval "has come down substantially," and it is "unclear" how additional data Reata says it will submit could convince the FDA to grant approval.

12.     Another analyst from Leerink wrote that "The bardoxolone saga highlights the pitfalls of relying on a management team's characterization of what the FDA has said they will require for the approval of a drug."

13.     Throughout the Class Period, Defendants made materially false and misleading statements about the Company's business. Defendants made materially false and misleading statements and failed to disclose that: (i) the FDA disagreed with Reata on several key factors relating to the Phase III clinical trial designs for bardoxolone; (ii) as a result, Reata's SEC filings concealed the true risks faced by the Company in gaining FDA approval for bardoxolone; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Reata's securities, Plaintiff, and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The federal law claims asserted here arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation with sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this District under § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b). Reata is headquartered in this District, Defendants conduct business in this District, and many of Defendants' actions took place within this District.

19.     In connection with the acts, omissions, conduct, and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

20.     Plaintiff acquired and held shares of Reata at artificially inflated prices during the Class Period, and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

21.     Defendant Reata is a Delaware corporation with principal executive offices located at 5320 Legacy Drive, Plano, Texas 75024. Reata's securities trade on the NASDAQ stock exchange under the ticker symbol "RETA."

22.     Defendant J. Warren Huff ("Huff") has served as Reata's Chief Executive Officer, President, and Chairman of the Board at all relevant times.

23.     Defendant Colin J. Meyer, M.D. ("Meyer") served as Reata's Chief Medical Officer until July 2020, when he was appointed Chief Research and Development Officer.

24.     Collectively, Defendants Huff and Meyer are referred to throughout this complaint as the "Individual Defendants."

25.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money, and portfolio managers and investors, *i.e.*, the market. The Individual Defendants

authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their position with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

26.     Reata is a clinical-stage biopharmaceutical company that focuses on small-molecule therapeutics. Among its lead product candidates is bardoxolone, which is being developed for multiple indications, including chronic kidney disease ("CKD") caused by Alport syndrome.

## FDA APPROVAL FOR NEW DRUG THERAPIES

27.     To obtain approval for a new drug (known as an "Investigational New Drug" or "IND"), the FDA requires sponsors to submit a New Drug Application ("NDA"). The goals of the NDA are to provide enough information to permit FDA reviewers to reach key decisions, including "whether the drug is safe and effective in its proposed use(s), and whether the benefits of the drug outweigh the risks."[1] This information is primarily supplied by data from the three clinical trial phases conducted in the years before the NDA filing. Phase 1 studies are conducted on a small group of patients or healthy volunteers. 21 C.F.R. § 312.21. Phase 2 studies focus on efficacy and can involve several hundred patients who have the condition the drug is intended to treat. *Id*. Phase

---

[1] https://www.fda.gov/drugs/types-applications/new-drug-application-nda.

3 studies involve several hundred to several thousand patients and further test efficacy and safety. *Id*.

28.     The FDA has a longstanding policy of keeping confidential its interactions with drug developers during clinical trials, only releasing information close to the time it decides whether to grant or deny approval to a new drug. This policy is in place even when a drug company directly misrepresents its interactions with the agency to the public.

29.     Before making a final decision on a particular NDA, the FDA will often designate an Advisory Committee to meet regarding the NDA and make a recommendation on approval to the FDA. When this occurs, the Advisory Committee releases a briefing book before the meeting. The briefing book contains detailed information about the clinical trials as well as the FDA's interactions with the sponsor. While the FDA makes the final decision on approval, the agency almost always follows the recommendation of the Advisory Committee. For example, of 136 Advisory Committee meetings for NDAs held from 2011 through 2016, the FDA went against the recommendation of the Advisory Committee on just 13 occasions, or less than 10% of the time.[2] As a result, investors find the information in briefing books to be strong indicators of a drug candidate's prospects for approval.

### MATERIALLY FALSE AND MISLEADING STATEMENTS

30.     The Class Period begins on November 14, 2016. On that day, the Company held a conference call with investors to provide an update on bardoxolone. During the call, Defendant Huff stated:

> We initially approached the FDA in August of this year seeking guidance on the design of the Phase 2 Program in Alport syndrome. ***We had a very collaborative interaction with the agency***, and during our type B meeting, the FDA suggests that a single pivotal Phase 2/3 trial that demonstrates the bardoxolone methyl produces

---

[2] http://eyeonfda.com/2016/08/adcomm-recommendations-how-often-fda-does-not-follow-them/.

a retained estimated GFR treatment benefit versus placebo could be sufficient to register the drug for approval in Alport syndrome.

> *The agency stated that a significant retained improvement estimated GFR after 48 weeks of treatment and four weeks off drug could support accelerated approval.* They added that full approval could be supported by similar data at the end of two years of treatment. Based on the guidance from the FDA, we decided to initiate a Phase 2/3 study in Alport syndrome. We'll begin by enrolling an open labeled Phase 2 cohort in the coming months and we'll provide guidance on the timing of those results after the study started. The Phase 3 cohort will begin enrolling after completion of the Phase 2 study.

31. During the November 14, 2016 call, Defendant Meyer stated:

> *As Warren [Huff] mentioned earlier, we have received clear guidance from FDA about requirements for approval of bardoxolone methyl in Alport syndrome, which will require only a single pivotal trial.* We have designed a trial in collaboration with international key opinion leaders in the Alport syndrome foundation. Many of the key elements from the trial have been decided during the process of finalizing the protocol.

*       *       *

> As shown in the diagram at the bottom of the slide, patients will be titrated from 5 milligrams to a final dose between 20 milligrams and 30 milligrams given orally once daily. The Phase 3 primary efficacy endpoint with a change from baseline in estimated GFR in bardoxolone methyl patients relative to placebo after 48 weeks. The estimated GFR change will be measured while the patients are on treatment, and *the key secondary endpoint over the change from baseline in the estimated GFR after withdrawal of drug for four weeks later at week 52.* After the initial withdrawal, patients will be started on study drug with their additional treatment assignment, and will continue to study drug for a second year. *Based on FDA guidance, if the trial is positive, the year one off treatment data could support accelerated approval, and the year two off treatment data could support full approval.*

32. On July 24, 2017, Reata issued a press release providing an update on the ongoing

CARDINAL study for bardoxolone. The press release provided in part:

> IRVING, Texas, July 24, 2017 – Reata Pharmaceuticals Inc. (NASDAQ:RETA) ("Reata" or "the Company") today reported initial data from the ongoing open-label Phase 2 portion of CARDINAL, a Phase 2/3 trial evaluating bardoxolone methyl ("bardoxolone") in patients with chronic kidney disease ("CKD") caused by Alport syndrome. Based upon these data, the Company has initiated screening in the Phase

8

3 portion of the trial and is planning to launch additional Phase 2 studies in rare renal diseases during the first half of 2018.

The Phase 2 portion of the trial enrolled 30 patients, and all patients remain on study. The available data demonstrate that bardoxolone significantly improved kidney function in Alport syndrome patients as measured by estimated glomerular filtration rate ("eGFR"). From a mean baseline eGFR of 54.7 mL/min/1.73 m$^2$, available data showed a mean improvement of 6.9 mL/min/1.73 m$^2$ at Week 4 (n=19; p<0.0005), increasing to 12.7 mL/min/1.73 m$^2$ at Week 12 (n=8; p<0.00005). Over 80% of patients demonstrated a clinically meaningful improvement in eGFR of at least 3.0 mL/min/1.73 m$^2$ by Week 8, and the 95% confidence interval at Week 12 was 7.9 mL/min/1.73 m$^2$ to 17.5 mL/min/1.73 m$^2$. The observed treatment effect surpasses the threshold of 3.0 mL/min/1.73 m$^2$ that was the minimum effect size necessary to proceed to the Phase 3 portion of the trial. No serious adverse events have been reported in the trial, and reported adverse events have generally been mild to moderate in intensity. The independent data monitoring committee reviewed all available safety data and voted to recommend opening the Phase 3 portion of the trial.

"***The ongoing Phase 2 portion of CARDINAL demonstrated clear improvements in renal function that are large in magnitude, occur in a high percentage of patients, and are highly statistically significant***," said Colin Meyer, M.D., Chief Medical Officer of Reata. "These results exceeded our expectations and bring us one step closer to the prospect of bardoxolone becoming the first effective treatment for this severe and life-threatening disease. We are eager to study bardoxolone in additional, rare renal diseases driven by inflammatory processes that bardoxolone addresses."

*       *       *

About the CARDINAL Clinical Study Design

CARDINAL is an international, multi-center Phase 2/3 study enrolling patients from 12 to 60 years old with a confirmed genetic or histological diagnosis of Alport syndrome. Patients must have baseline eGFR values between 30 to 90 mL/min/1.73 m$^2$ and must be receiving stable renin-angiotensin-aldosterone system blockade unless contraindicated. The Phase 2 portion of CARDINAL is open-label and enrolled 30 patients. The primary endpoint of the Phase 2 portion of the study is the eGFR change from baseline at 12 weeks. Final data from the Phase 2 CARDINAL trial will be available in 2H17.

The Phase 3 portion of CARDINAL is designed to support regulatory approval of bardoxolone for the treatment of Alport syndrome. It will be double-blind, placebo-controlled, and will randomize approximately 150 patients on a 1:1 basis to once-daily, oral bardoxolone or placebo. ***The eGFR change will be measured after 48 weeks while the patient is on treatment ("on-treatment eGFR") and***

*again after 52 weeks after the patient has stopped taking the study drug for a four-week withdrawal period ("retained eGFR")*. Based on guidance from the United States Food and Drug Administration (the "FDA"), the year one retained eGFR benefit data may support accelerated approval under subpart H. After withdrawal, patients will be restarted on study drug with their original treatment assignments and will continue on study for a second year. The second year on-treatment eGFR change will be measured after 100 weeks and the retained eGFR benefit will be measured after withdrawal of drug for four weeks at week 104. *Based upon guidance from the FDA, the year two retained eGFR benefit data may support full approva*l.

The Phase 3 primary efficacy endpoint is the on-treatment eGFR change from baseline in bardoxolone-treated patients relative to placebo at Week 48. The on-treatment eGFR change is designed to measure the full, treatment-related eGFR benefit of bardoxolone in Alport syndrome patients. The Phase 3 portion of the trial has 80% statistical power to detect a placebo-corrected, on-treatment eGFR improvement of 3.1 mL/min/1.73 m$^2$. The key secondary endpoint of the Phase 3 portion of the trial is the change from baseline in retained eGFR benefit after one year of treatment. The retained eGFR analysis is designed to demonstrate that bardoxolone has disease-modifying activity in Alport syndrome patients. The Phase 3 portion of the trial is statistically powered to detect a placebo-corrected, retained eGFR benefit of 2.2 mL/min/1.73 m$^2$. As a result of the observed eGFR effect, standard deviation, and intra-patient eGFR correlations in the Phase 2 study, the sample size of the Phase 3 study has been adjusted from 180 patients to 150 patients. The Company expects data from the Week 48 and Week 52 analyses during 2H19.

33.     On March 2, 2018, Reata announced its fourth quarter and full year 2017 financial

results in a press release that stated, in relevant part:

IRVING, Texas, March 2, 2018 – Reata Pharmaceuticals, Inc. (Nasdaq: RETA) (Reata or Company), a clinical-stage biopharmaceutical company, today announced financial results for the fourth quarter and full year ended December 31, 2017, and provided an update on the Company's business and product development programs.

"In 2017, Reata made significant strides towards our goal of building a deep pipeline of late-stage therapeutics for rare and life-threatening diseases," said Warren Huff, chief executive officer. "We entered 2017 with one pivotal trial in pulmonary arterial hypertension associated with connective tissue disease and a broad portfolio of exploratory Phase 2 studies from which we produced meaningful clinical data and launched pivotal trials in two additional rare diseases, Alport syndrome and Friedreich's ataxia. We begin 2018 with these three pivotal programs in the clinic, and a highly focused Phase 2 program in four rare forms of CKD underway."

Pipeline Highlights

In 2017, we launched and completed the Phase 2 portion of the Phase 2/3 CARDINAL study for bardoxolone methyl in patients with CKD caused by Alport syndrome. In the Phase 2 clinical trial, bardoxolone methyl demonstrated a statistically significant, mean increase from baseline in kidney function, as assessed by eGFR, at the 12 week endpoint.  On the basis of the Phase 2 results, we initiated the Phase 3 portion of the CARDINAL trial, which will enroll approximately 150 patients with Alport syndrome.  **_The United States Food and Drug Administration (FDA) has provided guidance that one year data from the ongoing Phase 3 portion of the trial demonstrating an improvement in retained eGFR, which is the increase in eGFR versus placebo after the patients have been taken off drug for four weeks, may support accelerated approval for bardoxolone methyl_**.

34.     On July 23, 2018, Reata held a conference call to provide an update on bardoxolone.

During the call, Defendant Huff stated in part:

With respect to the CARDINAL Phase II study, the key data being discussed today are the effect on estimated GFR of bardoxolone after 1 year of treatment or the on-treatment effect, as well as the retained eGFR of bardoxolone after 1 year of treatment and withdrawal of drug for 4 weeks, what we call the retained eGFR benefit. **_Of course, the on-treatment effect on eGFR is important because it represents the full clinical benefit to the patient while taking active drug_**.

The retained eGFR benefit is important because it provides data on the long-term effect of the drug on the risk of kidney failure and the need for dialysis or transplant. If you treat patients for a long term and then completely withdraw the drug, so that no active drug is present, and then compare the posttreatment kidney function to placebo, you can assess whether the treatment protected or harmed the kidney. If the post withdrawal eGFR is greater than placebo, it's evidence that the drug may delay kidney failure.

It also demonstrates that the on-treatment kidney function increase was not due to a damaging mechanism. If the treatment temporarily increased GFR through a mechanism that damaged the kidney, such as pressure-mediated hyperfiltration, when the drug was removed, the eGFR of the damaged kidney would be lower than both baseline and placebo. If kidney function is functioning better than placebo after withdrawal, it shows that the treatment benefited the organ.

**_We believe this is why the FDA has accepted the placebo-corrected retained eGFR benefit as the standard registrational endpoint in rare forms of CKD. FDA provided us with guidance in 2016 that they would take this endpoint for approval in Alport syndrome, and it's the key secondary endpoint in the Phase III study_**. They recently approved Otsuka's drug, tolvaptan, in April of this year based on the

same endpoint despite the retained benefit value being below baseline. By contrast, we've observed that bardoxolone improved retained eGFR above baseline in clinical trials to date.

35.      On January 3, 2019, Reata held a conference call to provide an update on bardoxolone. During the call, Defendant Meyer stated in part, that the FDA "agreed to the . . . estimated GFR based on retained benefit approval endpoints for . . . Alport syndrome," and that the FDA "specifically confirmed" that "the 4-week withdrawal duration being used in CARDINAL . . . is appropriate and conservative."

36.      On November 9, 2020, Reata announced the results from Year 2 of the Phase 3 CARDINAL study in a press release that stated, in relevant part:

> Reata Pharmaceuticals, Inc. (Nasdaq:RETA) ("Reata" or the "Company," or "we"), a clinical-stage biopharmaceutical company, today announced that the ***Phase 3 CARDINAL study of bardoxolone methyl ("bardoxolone") in patients with chronic kidney disease ("CKD") caused by Alport syndrome met its primary and key secondary endpoints at the end of Year 2.*** At Week 100, in the intent-to-treat ("ITT") population, which included estimated glomerular filtration rate ("eGFR") values for patients who either remained on or discontinued study drug, patients treated with bardoxolone had a statistically significant improvement compared to placebo in mean change from baseline in eGFR of 7.7 mL/min/1.73 m2 (p=0.0005). In the modified ITT ("mITT") analysis, which assessed the effect of receiving treatment by excluding values after patients discontinued treatment, patients treated with bardoxolone had a statistically significant improvement compared to placebo in mean change from baseline in eGFR at Week 100 of 11.3 mL/min/1.73 m2 (p<0.0001). At Week 104 (four weeks after last dose in second year of treatment), patients in the ITT population treated with bardoxolone had a statistically significant improvement compared to placebo in mean change from baseline in eGFR of 4.3 mL/min/1.73 m2 (p=0.023). Bardoxolone treatment was generally reported to be well-tolerated. In the long-term extension study ("EAGLE"), for the 14 patients who completed three years of treatment, bardoxolone treatment resulted in a mean increase from baseline in eGFR of 11.0 mL/min/1.73 m2. ***Based on these positive results and following a recently completed pre-NDA meeting with the U.S. Food and Drug Administration ("FDA"), we plan to proceed with the submission of an NDA for full marketing approval in the United States in the first quarter of 2021.*** We also plan to pursue marketing approval outside of the United States and work has commenced on preparations to file for marketing approval in Europe.

*      *      *

"Chronic kidney disease caused by Alport syndrome is a serious, progressive disease with an urgent need for new therapeutic options. ***The two-year CARDINAL study, now complete, represents the first time that an investigational medicine has shown a significant clinical benefit in this disease***, and it marks an important step toward making a treatment available for patients with Alport syndrome. We look forward to submitting our New Drug Application for bardoxolone in the first quarter of 2021. On behalf of everyone at Reata, I would like to express my sincere appreciation to all of the patients, families, and investigators who participated in the CARDINAL study," said Warren Huff, Reata's President and Chief Executive Officer.

*       *       *

***In rare forms of CKD, the FDA has accepted the off-treatment endpoint as the basis for approval.*** Withdrawal of drug after long-term treatment provides evidence whether a drug either protected or harmed the kidney during treatment. If off-treatment changes in eGFR are higher than placebo, this is evidence that the drug protected the kidney during treatment, and, if off-treatment changes in eGFR are lower than placebo, this is evidence that the drug harmed the kidney during treatment. ***An off-treatment eGFR benefit relative to placebo provides evidence that drug treatment may delay kidney failure.***

37.     Also on November 9, 2020, Reata filed its quarterly report for the period ended

September 30, 2020, stating in relevant part:

### Bardoxolone for CKD Caused by Alport Syndrome

On November 9, 2020, we announced that the ***Phase 3 CARDINAL study of bardoxolone in patients with CKD caused by Alport syndrome met its primary and key secondary endpoints at the end of Year 2***. At Week 100, in the intent-to-treat (ITT) population, which included eGFR values for patients who either remained on or have discontinued study drug, patients treated with bardoxolone had a statistically significant improvement compared to placebo in mean change from baseline in estimated glomerular filtration rate (eGFR) of 7.7 mL/min/1.73 m2 (p=0.0005). In the modified ITT (mITT) analysis, which assessed the effect of receiving treatment by excluding values after patients discontinued treatment, patients treated with bardoxolone had a statistically significant improvement compared to placebo in mean change from baseline in eGFR at Week 100 of 11.3 mL/min/1.73 m2 (p<0.0001). At Week 104 (four weeks after last dose in second year of treatment), patients in the ITT population treated with bardoxolone had a statistically significant improvement compared to placebo in mean change from baseline in eGFR of 4.3 mL/min/1.73 m2 (p=0.023). Bardoxolone treatment was generally reported to be well-tolerated. ***Based on these positive results and following a recently completed pre-NDA meeting with the U.S. Food and Drug Administration (FDA), we plan to proceed with the submission of an NDA for***

*full marketing approval in the United States in the first quarter of 2021*. We also plan to pursue marketing approval outside of the United States and work has commenced on preparations to file for marketing approval in Europe.

38.     That same day, Reata held a conference call with investors. During the call, Defendant Meyer stated that, at a recent pre-NDA meeting, "the FDA confirmed our NDA content and data plan, including the presentation and content of our safety data and the adequacy of our nonclinical and clinical pharmacology programs" and that "[t]he FDA indicated that they do not foresee an impediment to filing based on what [Reata had] provided." The Company therefore planned "to proceed with the submission of an NDA filing for full market approval in the first quarter of 2021."

39.     On March 1, 2021, Reata issued a press release in which it announced that it had submitted its NDA for bardoxolone to the FDA. The press release provided in part:

Reata Pharmaceuticals, Inc. (Nasdaq: RETA) ("Reata," the "Company," or "we"), a clinical-stage biopharmaceutical company, today announced that it has submitted a New Drug Application ("NDA") for bardoxolone methyl ("bardoxolone") for the treatment of chronic kidney disease ("CKD") caused by Alport syndrome to the U.S. Food and Drug Administration ("FDA").

*This NDA submission is based on the efficacy and safety data from the CARDINAL Phase 3 clinical trial.* The submission includes a request for Priority Review, which, if granted, would shorten the FDA's review of the NDA to eight months from the time of submission, versus a standard review timeline of 12 months. If approved, bardoxolone would become the first therapy specifically indicated for the treatment of CKD caused by Alport syndrome.
"This NDA submission marks an important step toward making a treatment available for patients with Alport syndrome, a serious, progressive disease with an urgent need for new therapeutic options," said Warren Huff, Reata's President and Chief Executive Officer. "I want to thank all those who made this moment possible, especially Alport syndrome patients and their families. We look forward to next steps on the path to making bardoxolone available as a first-in-class therapy for Alport syndrome, pending NDA acceptance, review, and drug approval."

40.     Also on March 1, 2021, Reata filed its annual report on Form 10-K for the period ended December 31, 2020. As to risks impacting regulatory approval of its drug product candidates, Reata stated, in relevant part:

> ***The clinical and commercial success of bardoxolone . . . will depend on a number of factors, many of which are beyond our control.***
>
> The clinical and commercial success of bardoxolone . . . will depend on a number of factors, including the following, many of which are beyond our control:
>
> - the timely initiation, continuation, and completion of our Phase 2 and Phase 3 clinical trials for bardoxolone and omaveloxolone, which will depend substantially upon requirements for such trials imposed by the FDA and other regulatory agencies and bodies;
>
> - our ability to demonstrate the safety and efficacy of our product candidates to the satisfaction of the relevant regulatory authorities;
>
> *        *        *
>
> - whether we are required by the FDA or other regulatory authorities to conduct additional clinical trials, and the scope and nature of such clinical trials, prior to approval to market our products; . . .
>
> We cannot assure you that we will ever be able to achieve profitability through the sale of, or royalties from, our product candidates. If we or our collaborators are not successful in obtaining approval for and commercializing our product candidates, or are delayed in completing those efforts, our business and operations would be adversely affected.

41.     On April 26, 2021, Reata announced that the FDA had accepted the NDA submission for bardoxolone and that the FDA planned to hold an Advisory Committee Meeting before the February 25, 2022 PDUFA date. The press release stated, in relevant part:

> Reata Pharmaceuticals, Inc. (Nasdaq: RETA) ("Reata," the "Company," or "we"), a clinical-stage biopharmaceutical company, today announced that the U.S. Food and Drug Administration ("FDA") accepted for filing the New Drug Application ("NDA") for bardoxolone methyl ("bardoxolone") for the treatment of patients with chronic kidney disease ("CKD") caused by Alport syndrome.

*This NDA submission is based on the efficacy and safety data from the CARDINAL Phase 3 clinical trial.* The FDA will review the application under a Standard Review timeline. The Prescription Drug User Fee Act ("PDUFA") date, the FDA action date for the application, is scheduled for February 25, 2022. The FDA also advised the Company that it is currently planning to hold an Advisory Committee meeting to discuss the application.

"*We are pleased with the FDA's decision to accept for filing our NDA for bardoxolone and look forward to continuing to work with the Division during the review process*," said Warren Huff, Reata's President and Chief Executive Officer. "Alport syndrome is one of the most rapidly progressive forms of CKD and a truly devastating disease to those patients and the families who are affected by it. If approved, bardoxolone may be the first therapy to slow the progression of kidney disease in patients with this serious and debilitating disease."

42.     On May 6, 2021, Reata announced its first quarter 2021 financial results and provided an update on its clinical development programs. The press release stated, in relevant part:

**Recent Company Highlights**

*Bardoxolone Methyl ("Bardoxolone") in Patients with Alport Syndrome*

In April 2021, we announced that the U.S. Food and Drug Administration ("FDA") accepted for filing Reata's New Drug Application ("NDA") for bardoxolone for the treatment of patients with chronic kidney disease ("CKD") caused by Alport syndrome. The FDA will review the application under a Standard Review timeline. The Prescription Drug User Fee Act ("PDUFA") date, the FDA action date for the application, is scheduled for February 25, 2022. The FDA also advised us that it is currently planning to hold an Advisory Committee meeting to discuss the application. If approved, bardoxolone may become the first therapy specifically indicated for the treatment of CKD caused by Alport syndrome.

"*We made significant progress during the first quarter of 2021 with the submission of our NDA for bardoxolone for the treatment of CKD caused by Alport syndrome coming less than four months after reporting positive results from Year 2 of our Phase 3 CARDINAL trial*," said Warren Huff, Reata's President and Chief Executive Officer. "Alport syndrome is a devastating disease that affects 30,000 to 60,000 patients in the United States. *We are pleased with the FDA's recent decision to accept our application for filing and look forward to continuing to work with the FDA during its review of our application*."

43.     That same day, Reata filed its quarterly report on Form 10-Q for the period ended March 31, 2021, stating in relevant part:

16

**Bardoxolone in Patients with CKD Caused by Alport Syndrome**

On April 26, 2021, we announced that the U.S. Food and Drug Administration (FDA) accepted for filing the New Drug Application (NDA) for bardoxolone for the treatment of patients with CKD caused by Alport syndrome. The FDA will review the application under a Standard Review timeline. The Prescription Drug User Fee Act (PDUFA) date, the FDA action date for the application, is scheduled for February 25, 2022. The FDA also advised us that it is currently planning to hold an Advisory Committee meeting to discuss the application.

Our NDA submission was based on the results of Year 2 of the Phase 3 CARDINAL study of bardoxolone in patients with CKD caused by Alport syndrome announced in November 2020. *The study met its primary and key secondary endpoints following two years of treatment (referred to as Year 2).* Moreover, we also announced that patients who completed one year in the EAGLE long-term extension study and were treated with bardoxolone for a total of three years (n=14) showed a sustained and significant increase from baseline in estimated glomerular filtration rate (eGFR). *Together, these data suggest that bardoxolone treatment has beneficial long-term effects on kidney function in patients with Alport syndrome.*

44.     On August 9, 2021, Reata announced its second quarter 2021 financial results and provided an update on its clinical development programs. The press release provided in part:

*Bardoxolone Methyl ("Bardoxolone") in Patients with Alport Syndrome*

The NDA for bardoxolone for the treatment of patients with chronic kidney disease ("CKD") caused by Alport syndrome is currently under review by the FDA. The FDA completed a bio-research monitoring inspection of Reata. We did not receive any observations. *We also recently completed a mid-cycle communication meeting with the FDA. While we have not yet received formal minutes from the FDA, in the preliminary agenda for, and during, the meeting, the FDA identified four significant clinical and statistical review issues for us to address.* The FDA invited us to respond to its identified issues in follow-up submissions to the NDA, and *we believe each of the identified issues is addressable with additional data and analyses.* The FDA did not designate any safety issues as significant issues, and it stated that, based on its current review, it does not believe a Risk Evaluation and Mitigation Strategies ("REMS") program is needed. The FDA also advised us that an Advisory Committee meeting is tentatively scheduled for December 8, 2021. The Prescription Drug User Fee Act ("PDUFA") date, the FDA action date for the application, is scheduled for February 25, 2022.

45.     Also on August 9, 2021, Reata filed its quarterly report on Form 10-Q for the period ended June 30, 2021, stating in relevant part:

**Bardoxolone in Patients with CKD Caused by Alport Syndrome**

On April 26, 2021, we announced that the U.S. Food and Drug Administration (FDA) accepted for filing the NDA for bardoxolone for the treatment of patients with CKD caused by Alport syndrome, and the NDA is currently under review by the FDA. The FDA completed a bio-research monitoring inspection of Reata. We did not receive any observations. We also recently completed a mid-cycle communication meeting with the FDA. ***While we have not yet received formal minutes from the FDA, in the preliminary agenda for, and during, the meeting, the FDA identified four significant clinical and statistical review issues. We believe each of these issues are addressable with additional data and analyses, and the FDA invited us to address its identified issues in follow-up submissions to the NDA.*** We plan to address each of the issues through the submission of additional data and analyses to the NDA. See *Programs in Chronic Kidney Disease – Bardoxolone in Patients with CKD Caused by Alport Syndrome below*.

***The FDA made additional information requests and identified a few additional issues that were not deemed significant.*** The FDA did not designate any safety issues as significant issues, and it stated that, based on its current review, it does not believe a Risk Evaluation and Mitigation Strategies (REMS) program is needed. We were notified that we would be receiving comments in writing regarding Chemistry, Manufacturing, and Controls (CMC), and we will not be receiving any nonclinical comments. The FDA also advised us that an Advisory Committee meeting is tentatively scheduled for December 8, 2021. The Prescription Drug User Fee Act (PDUFA) date, the FDA action date for the application, is scheduled for February 25, 2022.

46.     The statements identified in ¶¶ 30-45 above were materially false and misleading and failed to disclose material facts about the Company's business, operations, and prospects. As alleged Defendants misled investors by misrepresenting and failing to disclose: (1) that on numerous occasions, the FDA had raised concerns regarding the validity of the clinical study designed to measure the efficacy and safety of bardoxolone for the treatment of CKD caused by Alport syndrome; (2) that, as a result, there was a material risk that Reata's NDA for bardoxolone would not be approved; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis.

## THE TRUTH EMERGES

47.     On August 10, 2020, Defendants provided a "regulatory update" regarding the timing of its filing its NDA for bardoxolone. Defendants stated that the FDA could require Reata to wait for second-year data from the CARDINAL trials before it could submit its NDA for approval and would delay of the filing of the NDA beyond the time period previously provided by the Company.

48.     Reata's stock price fell by approximately 33% on this news, from its closing price of $156.20 per share on Friday August 7, 2020 to $104.41 on August 10, 2020.

49.     On December 6, 2021, the FDA released its Briefing Book before the December 8, 2021 Advisory Committee Meeting to determine whether the Advisory Committee would recommend bardoxolone for approval to the FDA. Among the most serious concerns the FDA had with Reata's Phase 3 clinical trial design was that of the key secondary endpoint, which the Company explained would be the "change from baseline in the estimated GFR after withdrawal of drug for four weeks." The Briefing Book revealed that, as early as an October 2016 pre-IND meeting, the FDA had repeatedly "voiced concerns about the time-course for resolution of bardoxolone's pharmacodynamic effect on creatine/eGFR following discontinuation of treatment and whether the off-treatment values collected in CARDINAL Phase 3 were in fact capturing an effect on disease progression." The FDA therefore recommended that Reata conduct a separate study to characterize the time course for resolution of bardoxolone's pharmacodynamic effect. The FDA again raised these same concerns "about the interpretability of eGFR findings given available information on the time course for resolution of bardoxolone's pharmacodynamic effect" in January 2020 and September 2020 meetings with Reata. In other words, the FDA repeatedly told Reata that it was concerned the four-week withdrawal period was too short to distinguish between any effect on disease progression and mere reversible pharmacodynamic treatment effects: the

CARDINAL Phase 3 trial, as designed, was likely incapable of producing sufficient data to demonstrate efficacy.

50.     The Briefing Book detailed the concerns the FDA had raised with Reata during the clinical studies and NDA submission:

*Bardoxolone's pharmacodynamic effect on eGFR and assessing for effects on disease progression*: At a preIND meeting held in October 2016, the Division indicated that because of bardoxolone's pharmacodynamic effect on kidney function, on-treatment assessments of kidney function would be difficult to interpret as a drug effect on disease progression. As such, a post- treatment assessment of creatinine should be used to assess bardoxolone's efficacy in treating the disease. Following submission of the IND in 2016, ***the Agency repeatedly voiced concerns about the time-course for resolution of bardoxolone's pharmacodynamic effect on creatinine/eGFR following discontinuation of treatment and whether the off-treatment values collected in CARDINAL Phase 3 were in fact capturing an effect on disease progression.*** The Agency ultimately recommended that the Applicant conduct a separate study to characterize the time course for resolution of bardoxolone's pharmacodynamic effect or modify CARDINAL Phase 3 to obtain the information (i.e., revise the protocol to include additional off-treatment eGFR measurements).

*Accelerated Approval*: In January and September 2020, the Applicant met with Agency to discuss submission of an NDA for bardoxolone under the accelerated approval pathway based primarily on the Year 1 data on eGFR from CARDINAL Phase 3. ***The Division did not agree with the proposed approach, voicing concerns about the interpretability of the eGFR findings given the available information on the time course for resolution of bardoxolone's pharmacodynamic effect, as well as the amount of missing data in the bardoxolone arm and lack of clarity on how patients with missing data were handled in key analyses intended to disentangle the drug's pharmacodynamic effect on kidney function from its effect on the irreversible loss of kidney function.***

*Bardoxolone's effects on blood pressure and albuminuria*: At the January and September 2020 meetings with the Applicant, the Agency voiced concern about bardoxolone's effects on blood pressure and albuminuria and whether, over the long term, these effects could accelerate progression to kidney failure.

*Trial integrity*: In November 2020, the Applicant submitted an addendum to their SAP dated October 30, 2020, and an amended Data Access Plan dated August 28, 2020 for CARDINAL Phase 3. In its December 2020 response to the submission, the Agency expressed concern about the number of individuals with access to patient-level clinical data and individual treatment assignments following the interim analysis of data from Year 1, as well as the late changes to the study's SAP,

and provided specific recommendations on additional information and analyses that should be included in the Applicant's marketing application to address the integrity of the trial data. [Footnote omitted.]

51.     Though the FDA agreed that Reata's Phase 3 study met its endpoints, "the FDA review team d[id] not believe the submitted data demonstrate that bardoxolone is effective in slowing the loss of kidney function in patients with AS and reducing the risk of progression to kidney failure." Among other things, the FDA noted that a "treatment can have both reversible [pharmacodynamic] effects on kidney function as well as change the trajectory of the decline in kidney function . . ., but it can be difficult to tease apart the contribution of each component in trials with short treatment duration and/or when off-treatment measurements of eGFR are obtained before the pharmacodynamic effect on eGFR has fully reversed." It also stated:

> The CARDINAL Phase 3 study consisted of two years of longitudinal on-treatment eGFR assessments with two 4-week washout periods, after Year 1 and Year 2, respectively. The time-course of eGFR changes in the bardoxolone and placebo groups is shown in Figure 4 [omitted]. eGFR increased compared to placebo while on treatment at Week 48 and Week 100, as evaluated by the primary efficacy endpoint; however, eGFR decreased during each of the 4-week washout periods, suggesting that the on-treatment increase in eGFR was, at least in part, a result of the reversible PD effect of bardoxolone on eGFR. If the duration of the washout was long enough to eliminate the reversible PD effect on eGFR, then changes in eGFR compared with placebo at the end of the Year-2 washout period could indicate bardoxolone's effect on slowing disease progression. ***A key issue was to determine if the study's 4-week washout was long enough for the reversible PD effect on eGFR to have resolved.***
>
> [Reata] has justified the 4-week washout in CARDINAL Phase 3 based on: various pooled analyses of patients across studies with eGFR measurements collected up to 42 days off-treatment; off-treatment eGFR measurements for studies in patients with CKD with treatment duration ≤8 weeks; the pharmacokinetic (PK) profile of bardoxolone; exposure-response modeling; and time to return to baseline of other PD markers, such as liver enzymes. ***The FDA has not found these justifications compelling to support the adequacy of a 4-week washout in patients with AS***, as described in Appendix 6.4.

52.     On this news, the price of Reata shares fell $29.91 per share, or 37%, to close at $48.92 per share on December 6, 2021, on unusually heavy trading volume.

## POST-CLASS PERIOD DEVELOPMENTS

53.     The seriousness of the FDA's disagreements with Reata's designs was confirmed when the FDA's Advisory Committee convened just two days later on December 8, 2021. The result was a unanimous 13 to 0 vote against recommending bardoxolone for approval, with the Advisory Committee members finding that bardoxolone did not prove effective in slowing the progression of CKD in patients with Alport syndrome and that its benefits did not outweigh the risks based on the data Reata submitted. The Advisory Committee vote led Reata's shares to plummet even further, closing at $29.11 per share on December 9, 2021 – down 63% from December 6, 2021.

54.     The falsity of Defendants' representations to investors was summed up by an analyst from Leerink, who, after the Advisory Committee vote, wrote, "The bardoxolone saga highlights the pitfalls of relying on a management team's characterization of what the FDA has said they will require for the approval of a drug."

## STOCK OFFERINGS AND INSIDER SALES

55.     In the midst of this wrongdoing, Reata raised nearly $1 billion from investors in secondary offerings throughout the Class Period, including: $240 million in July 2018; $440 million in November 2019; and $280 million in December 2020. The offering documents accompanying these capital raises contained the same false statements and omissions and/or failed to correct the misrepresentations alleged herein.

56.     Similarly, Reata insiders made significant sales of Reata stock at inflated prices throughout the wrongdoing alleged herein.

57.     Defendant Meyer sold over $17 million in Reata shares: on November 9, 2020, Meyer sold 25,000 shares at $175.00 per share for total proceeds of $4,375,000; on November 16,

2020, Meyer sold 25,000 shares at $169.57 per share for total proceeds of $4,239,148; and on June 15, 2021, Meyer sold 60,000 shares at $142.58 per share for total proceeds of $8,554,906. Only Meyer's November 9, 2020 sale was part of a pre-arranged 10b5-1 trading plan, and even then, that plan was not adopted until November 2019 – well after the misrepresentations concerning communications with the FDA regarding potential approval for bardoxolone were made.

58.    Defendant Huff sold 63,000 shares at $86.61 per share on September 27, 2019 for total proceeds of $5,456,115, and sold 81,657 shares at $175.01 per share on November 10, 2020 for total proceeds of $14,291,048. Like Meyer, only Huff's November 10, 2020 sale was part of a pre-arranged trading plan – also adopted in November 2019.

59.    Elaine Castellanos, Reata's Chief Accounting Officer, sold 10,000 shares at $124.55 per share on May 26, 2021 for total proceeds of $1,245,470, and sold 10,000 shares at $142.58 per share on June 15, 2021 for total proceeds of $1,426,513.

## CLASS ACTION ALLEGATIONS

60.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Reata securities between November 14, 2016 and December 6, 2021, inclusive. Excluded from the Class are Defendants, directors, and officers of the Company, as well as their families and affiliates.

61.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, Reata's shares actively traded on the NASDAQ stock exchange. Although the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Reata's shares

were publicly traded during the Class Period on the NASDAQ stock exchange.  Record owners and other members of the Class may be identified from records maintained by Reata or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

62.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

     a.  Whether Defendants violated the Exchange Act;

     b.  Whether Defendants omitted and/or misrepresented material facts;

     c.  Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

     d.  Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

     e.  Whether the price of the Company's securities was artificially inflated; and

     f.  The extent of damage sustained by Class members and the appropriate measure of damages.

63.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

64.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

65.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FRAUD ON THE MARKET

66.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

    a.  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b.  The omissions and misrepresentations were material;

    c.  The Company's securities traded in efficient markets;

    d.  The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

    e.  Plaintiff and other members of the class purchased the Company's securities between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

67.     At all relevant times, the markets for the Company's securities were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's securities, which reflected all information in the market, including the misstatements by Defendants.

**NO SAFE HARBOR**

68.     The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

69.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

**LOSS CAUSATION**

70.     Reata's stock price declined on August 10, 2020 by approximately 33% as the Company warned of a delay in the filing of its NDA for bardoxolone. This signaled the first problem to investors of Reata obtaining FDA approval for bardoxolone. Reata's stock price then declined on December 6, 2021 by 37% in response to the news and information contained in the FDA's Briefing Book. The information in the Briefing Book corrected prior misrepresentations made. Reata's stock price further declined on December 8, 2021 when the FDA Advisory Committee voted unanimously to recommend against approval of bardoxolone, further correcting the misrepresentations made as alleged herein.

71.     These revelations contradicted statements made by Defendants during the Class Period and were a causal element of the concurrent decline in the Company's share price.

**SCIENTER ALLEGATIONS**

72.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the

federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Reata, their control over, and/or receipt and/or modification of Reata's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Reata, participated in the fraudulent scheme alleged herein.

<u>**Count One**</u>
**Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

73.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74.    During the Class Period, Defendant Reata, and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

75.    Defendant Reata and the Individual Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

76.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's securities. Plaintiff and the Class would not have purchased the Company's securities at the price paid, or at all, if they had

been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

### Count Two
### Violation of § 20(a) of the Exchange Act
### (Against the Individual Defendants)

77.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

78.     The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents described above that contained statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

(b)     awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

(c)     awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(d)     awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: January 20, 2022                    Respectfully submitted,

*/s/ William B. Federman*
William B. Federman
**FEDERMAN & SHERWOOD**
212 W. Spring Valley Road
Richardson, TX 75081
(405) 235-1560
wbf@federmanlaw.com

*/s/ Jeffrey C. Block*
Jeffrey C. Block*
Jacob A. Walker*
Nathaniel Silver*
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockleviton.com
jake@blockleviton.com
nate@blockleviton.com

*\*(Pro Hac to be filed)*

*Attorneys for Plaintiff*

## PLAINTIFF'S CERTIFICATION OF SECURITIES
## FRAUD CLASS ACTION COMPLAINT

Matthew A. Archer, on behalf of the Laborers' District Council and Contractors' Pension Fund of Ohio ("Plaintiff"), hereby certifies:

1.      Plaintiff has reviewed the complaint captioned *Laborers' District Council and Contractors' Pension Fund of Ohio v. Reata Pharmaceuticals, Inc.* and authorize its filing.

2.      Plaintiff did not purchase the securities which are the subject of the complaint at the direction of counsel, or in order to participate in any private action arising under the federal securities laws.

3.      Attached hereto as Exhibit 1 is a list of all Plaintiff's transactions in the Company's securities during the Class Period.

4.      Plaintiff is willing to serve as a representative party on behalf of the class in this action, including providing testimony at deposition and trial, if necessary.

5.      During the three-year period preceding the date of Plaintiff's signing this Certification, Plaintiff has not sought to serve, nor has it served, as a representative to any party on behalf of a class in any private action arising under the federal securities laws.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the Class beyond Plaintiff's *pro rata* share of any possible recovery, except for an award, as ordered or approved by the court, for reasonable costs and expenses (including lost wages) directly relating to Plaintiff's representation of the Class.

1

Signed under the penalties of perjury this 18th day of January, 2022.




LABORERS' DISTRICT COUNCIL AND
CONTRACTORS' PENSION FUND OF
OHIO

By: _____

Matthew A. Archer
Administrative Manager

**EXHIBIT 1**

| PURCHASES | | | | | SALES | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Units | Unit Price | Total Cost | | Date | Units | Unit Price | Total Proceeds |
| 02/11/2019 | 121 | 83.8131 | $10,141.38 | | 08/27/2019 | 317 | 72.0027 | $22,824.85 |
| 02/12/2019 | 149 | 84.9273 | $12,654.16 | | 05/11/2020 | 325 | 164.0979 | $53,331.81 |
| 02/13/2019 | 171 | 83.6349 | $14,301.56 | | 08/10/2020 | 100 | 114.0323 | $11,403.23 |
| 02/14/2019 | 186 | 86.6269 | $16,112.60 | | 08/10/2020 | 600 | 113.7771 | $68,266.26 |
| 02/15/2019 | 176 | 86.8919 | $15,292.97 | | 08/10/2020 | 1000 | 111.7824 | $111,782.40 |
| 02/19/2019 | 149 | 86.3257 | $12,862.52 | | 08/11/2020 | 200 | 107.9012 | $21,580.24 |
| 02/20/2019 | 174 | 87.3979 | $15,207.23 | | 08/17/2020 | 200 | 107.8319 | $21,566.38 |
| 02/27/2019 | 123 | 91.5687 | $11,262.95 | | 08/18/2020 | 100 | 107.7624 | $10,776.24 |
| 01/21/2020 | 100 | 213.285 | $21,328.50 | | 08/19/2020 | 100 | 107.997 | $10,799.70 |
| 01/21/2020 | 100 | 211.9674 | $21,196.74 | | 08/20/2020 | 25 | 107.4541 | $2,686.35 |
| 01/22/2020 | 75 | 213.385 | $16,003.87 | | 08/27/2020 | 447 | 100.9711 | $45,134.08 |
| 02/04/2020 | 100 | 244.9002 | $24,490.02 | | 11/13/2020 | 53 | 175.4504 | $9,298.87 |
| 02/05/2020 | 75 | 228.741 | $17,155.57 | | 11/16/2020 | 35 | 170.575 | $5,970.12 |
| 02/06/2020 | 100 | 220.1586 | $22,015.86 | | 11/17/2020 | 41 | 163.9935 | $6,723.73 |
| 02/21/2020 | 250 | 214.8509 | $53,712.72 | | 11/18/2020 | 38 | 167.411 | $6,361.61 |
| 02/24/2020 | 25 | 198.8724 | $4,971.81 | | 11/19/2020 | 42 | 166.7565 | $7,003.77 |
| 03/30/2020 | 100 | 154.4483 | $15,444.83 | | 12/06/2021 | 125 | 47.6072 | $5,950.90 |
| 03/31/2020 | 50 | 146.2025 | $7,310.12 | | 12/06/2021 | 170 | 48.4419 | $8,235.12 |
| 04/03/2020 | 25 | 128.2502 | $3,206.25 | | 12/07/2021 | 115 | 52.8883 | $6,082.15 |
| 04/15/2020 | 100 | 142.8628 | $14,286.28 | | 12/09/2021 | 471 | 33.1585 | $15,617.65 |
| 04/16/2020 | 50 | 139.9856 | $6,999.28 | | | | | |
| 04/16/2020 | 50 | 141.5066 | $7,075.33 | | | | | |
| 05/13/2020 | 100 | 159.2604 | $15,926.04 | | | | | |
| 05/27/2020 | 100 | 152.91 | $15,291.00 | | | | | |
| 06/04/2020 | 225 | 130.0793 | $29,267.84 | | | | | |
| 06/04/2020 | 100 | 131.1401 | $13,114.01 | | | | | |
| 06/05/2020 | 200 | 126.6529 | $25,330.58 | | | | | |
| 06/09/2020 | 100 | 134.6598 | $13,465.98 | | | | | |
| 06/11/2020 | 45 | 167.3905 | $7,532.57 | | | | | |
| 06/11/2020 | 43 | 170.2879 | $7,322.37 | | | | | |
| 06/12/2020 | 48 | 159.221 | $7,642.60 | | | | | |
| 06/25/2020 | 46 | 164.5311 | $7,568.43 | | | | | |
| 06/29/2020 | 68 | 157.7591 | $10,727.61 | | | | | |
| 06/30/2020 | 50 | 154.1475 | $7,707.37 | | | | | |
| 07/01/2020 | 53 | 154.7858 | $8,203.64 | | | | | |
| 07/07/2020 | 75 | 159.181 | $11,938.57 | | | | | |

| | | | |
|---|---|---|---|
| 07/09/2020 | 75 | 156.1424 | $11,710.68 |
| 07/21/2020 | 100 | 159.485 | $15,948.50 |
| 07/28/2020 | 100 | 151.41 | $15,141.00 |
| 07/31/2020 | 125 | 148.3674 | $18,545.92 |
| 08/05/2020 | 100 | 150.0881 | $15,008.81 |
| 08/14/2020 | 101 | 101.4567 | $10,247.12 |
| 08/17/2020 | 117 | 107.2777 | $12,551.49 |
| 08/18/2020 | 84 | 107.6109 | $9,039.31 |